**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

CHAINALYSIS GOVERNMENT SOLUTIONS, LLC

Plaintiff,

v.

UNITED STATES

Defendant.

No. ________

(Judge________)

[redacted]

## COMPLAINT

Plaintiff Chainalysis Government Solutions, LLC ("CGS"), by and through its undersigned counsel, files this Complaint against Defendant the United States of America, acting through the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE" or "Agency"), and states as follows:

## SUMMARY

1. This is a post-award bid protest action challenging the Agency's decision to award a sole-source contract valued at $94,655,840.00 to TRM Labs, Inc. ("TRM") under Solicitation No. 192126VHQ4CCC00XX to utilize TRM forensic software and support services to support Homeland Security Task Force ("HSTF") investigations.

2. This procurement concerns the largest blockchain analytics contract ever awarded by the United States Government. Yet, instead of conducting the full and open competition that Congress and the Federal Acquisition Regulation ("FAR") strongly favor for procurements of this magnitude, the Agency elected to bypass competition altogether and award an approximately $100 million sole-source contract to TRM.



[redacted]

3. As set forth below, the Court should find that the Agency's determination to award a sole-source contract to TRM violated the Competition in Contracting Act's ("CICA") mandate to obtain full and open competition and was deficient on multiple independent grounds. First, the record shows that CGS's capability statement demonstrated the ability to satisfy all the requirements set forth in the Agency's Statement of Need, which renders unreasonable the Agency's determination that only one responsible source, TRM, could meet the needs of the Agency.

4. Second, the record demonstrates that the Agency improperly based its sole-source award on its Request for Information ("RFI") rather than on the Statement of Need which is the controlling document and reflects the Agency's *actual* requirements. In this regard, the record shows that the Agency directed potential alternative sources like CGS to submit capability statements against one set of requirements set forth in the Statement of Need. The Agency then claimed that a sole-source award was justified because CGS and other alternative sources did not demonstrate capabilities that were referenced in the RFI but were conspicuously missing from the Statement of Need. In other words, the Agency solicited capability statements against one set of requirements but justified its sole-source award based on a different set of requirements that were not sought in capability statements from offerors like CGS. That is quintessential arbitrary and capricious conduct.

5. Critically, the record demonstrates that CGS was prejudiced by the Agency's failure to inform interested offerors like CGS of its apparent actual requirements. Indeed, CGS would have demonstrated its ability to satisfy the Agency's requirements in its capability statement if the Agency disclosed its apparent actual requirements by including those capabilities in the Statement of Need or otherwise informing interested offerors that they would be evaluated



[redacted]

against the additional RFI requirements. The Agency's sole-source justification therefore improperly relied on omissions from capability statements which solely derived from the Agency's failure to disclose the capabilities it ultimately deemed dispositive.

6. Third, the record demonstrates that the Agency failed to meaningfully consider CGS's capability statement as required by the Revolutionary FAR Overhaul ("RFO") and well-settled bid protest case law. In this regard, the record shows that the Agency's Notice of Intent ("NOI") to award a sole-source to TRM was a textbook example of the *pro forma*, check-the-box capability statement exercise that will not withstand scrutiny. Indeed, the Agency afforded potential alternative sources like CGS only three days to prepare and submit capability statements in response to the NOI, limited capability statement submissions to a single page when the NOI's Statement of Need itself exceeded that length, asked no follow-up questions or sought any clarifications from CGS before terminating the market research process one day after submissions were due, and ultimately evaluated CGS against capabilities that were not disclosed in the Statement of Need. Collectively, these actions demonstrate that the Agency did not undertake the meaningful consideration required to determine whether CGS or other interested offerors could satisfy its actual requirements.

7. Fourth, as noted above, the Agency improperly based its sole-source justification on the requirements set forth in the RFI rather than those set forth in the Statement of Need. In addition to the reasons discussed above, the Agency's reliance on the RFI's restrictive specifications to justify limiting competition violated CICA because the Agency failed to establish that those restrictive specifications reflected its actual minimum needs. Indeed, the record demonstrates that CGS's proposed solution, as set forth in its RFI response, could satisfy the Agency's RFI requirements. However, the Agency's Justification and Approval ("J&A")



[redacted]

neither addresses those proposed solutions nor explains why they would fail to satisfy the Agency's minimum needs. Instead, the J&A reflects that the Agency simply assumed that the RFI's restrictive specifications represented its minimum needs without providing the analysis or justification that CICA requires when an agency relies on restrictive requirements to limit competition. The Agency's failure to consider CGS's less restrictive solutions or to explain why such solutions were inadequate provides an additional basis for this Court to find the Agency's sole-source justification arbitrary, capricious, and contrary to law.

8. Fifth, the Agency's sole-source award is also contrary to law because it is predicated on a justification that the RFO deliberately eliminated. The RFO was enacted to promote faster acquisitions and greater competition by narrowing the circumstances in which agencies may dispense with full and open competition. Yet the record shows that the Agency justified the sole-source award to TRM using the very "unique capabilities" rationale that existed under former FAR 6.302-1 but was omitted from the RFO adopted by the Agency before this procurement began. Having elected to operate under the RFO, the Agency could not revive a superseded sole-source exception to avoid competition. Simply put, the Agency's reliance on a justification no longer authorized by the governing regulations renders the sole-source award contrary to law.

9. For these and other reasons, expounded below, the Court should hold that the Agency's decision to award a sole-source contract to TRM was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and regulation and should grant CGS's request for declaratory and permanent injunctive relief.



[redacted]

**PARTIES**

10. Plaintiff CGS, headquartered in Ashburn, Virginia, is a proven Homeland Security Investigations ("HSI") prime contractor that provides software, data, training, and Full-Time Equivalent support, all of which directly support mission requirements.

11. Defendant is the United States of America, acting by and through the Department of Homeland Security, Immigration and Customs Enforcement. The contracting officer for this procurement is Gregory Hermsen.

**JURISDICTION**

12. The Court has jurisdiction over this post-award bid protest under 28 U.S.C. § 1491(b)(1), which states that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

13. CGS has standing and is an interested party to pursue this protest because it was an actual offeror and its direct economic interests will be affected by the Agency's arbitrary, capricious, and unreasonable decision to award a sole-source contract on the basis of a finding that there is only one responsible source available when CGS submitted a capability statement that clearly meets the Agency's needs. *See* 28 U.S.C. § 1491(b)(1); *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (adopting for purposes of the Tucker Act the definition of "interested party" in 31 U.S.C. § 3551(2) as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or by failure to award the contract"); *CSI Aviation, Inc. v United States*, 181 Fed. Cl.



[redacted]

143, 174–75 (2026) (requiring protestor in sole-source context to demonstrate only that "it 'could compete for the contract' if the procurement were made competitive — that is, it 'would have been a qualified bidder.'").

14. As detailed below, CGS's capability statement showed that it could meet all the requirements stated in the Agency's Statement of Need. CGS's capability statement demonstrates that it tackles scam disruption "through Alterya's AI-powered adversarial collection, which supports victim-complaint triage, automated victim outreach and support, and criminal-syndicate clustering by [redacted]." Ex. A, CGS Capability Statement at 1. This maps directly to the Statement of Need requirement that the capability statement demonstrate that the technological solution has "AI-powered triage of victim complaints and clustering of criminal syndicates." Ex. B, Statement of Need at 1.

15. Moreover, as noted above and discussed below, the Agency improperly based its sole-source award on the requirements set forth in the RFI rather than the Statement of Need. But the Statement of Need is the controlling document that represents the Agency's needs for purposes of this procurement. Had the Agency indicated in the Statement of Need that interested parties had to demonstrate the capability to meet the exact specifications in the RFI to be considered for award, CGS would have demonstrated all such capabilities. *See* Ex. C, Decl. of [redacted] ¶¶ 24-26.

16. The J&A highlights the following capabilities of TRM: (1) large-scale international scam victim dataset; (2) automated downstream notifications for the virtual asset service providers ("VASP"); and (3) operational partnerships. Ex. D, J&A at 5. But, had CGS



[redacted]

been on notice of these requirements, it would have: (1) acquired a dataset of the required size and scale, Decl. of [redacted] ¶ 24; (2) integrated the automated notification function into its program, *id.* ¶ 25; and (3) established an operational partnership, *id.* ¶ 26.

17. Therefore, CGS is an interested party for purposes of the Tucker Act and CGS was prejudiced by the Agency's actions because, but for its errors, the Agency would have recognized that CGS's capabilities could satisfy the Agency's needs. Further, as the only other offeror to submit a response to the NOI, CGS would have had a substantial chance of receiving a contract award given its capabilities and relevant past performance. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) ("To establish prejudice, the protestor must show that there was a substantial chance it would have received the contract award but for the alleged error in the procurement process."); *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (applying the same standard for sole-source cases); *see also CSI Aviation, Inc.*, 181 Fed. Cl. at 175–76 (same). Simply put, CGS would have been a qualified bidder with a substantial chance of receiving a contract award because it can perform the work required by the Agency and it was the only company to submit a response to the NOI.

## STATEMENT OF FACTS

### I. AGENCY'S REQUEST FOR INFORMATION

18. On May 28, 2026, the Agency issued the RFI and requested responses by June 2, 2026. Ex. E, RFI at 2. The RFI stated that the HSTF National Coordination Center ("NCC") Cyber Disruption Center ("CDC") required "advanced technology solutions and operational support to fulfill its mission under Executive Order ("EO") 14390." *Id.*; Exec. Order No. 14390, 91 Fed. Reg. 12051 (Mar. 11, 2026) (Combating Cybercrime, Fraud, and Predatory Schemes Against American Citizens). The Agency's description provided that current Federal resources



[redacted]

and processes were insufficient to combat evolving cyberthreats, including fraud, ransomware, and sextortion. RFI at 2–3.

19. The RFI explained that it was "not a solicitation announcement." *Id.* at 3. Rather, it was solely for market research and acquisition planning and information purposes. *Id.* The Government also did not commit to issue a subsequent solicitation or contract based on RFI responses. Specifically, it stated the RFI "is not to be construed as a commitment by the Government to issue a subsequent solicitation (Broad Agency Announcement, Request for Proposal, etc.). This RFI does not commit the Government to contract for any supply or service." *Id.* The RFI further noted that "[t]he information provided in this RFI is subject to change and is not binding on the Government." *Id.*

20. The RFI itself comprised of 18 prompts. *See generally* Ex. F, RFI Response. Substantively, the RFI asked respondents the following questions:

> 6. List any established contract vehicles your company holds that would be appropriate for the scope of this work ([National Aeronautics and Space Administration ("NASA") Solutions for Enterprise-Wide Procurement ("SEWP")], [General Services Administration ("GSA")), etc).
>
> 7. Does your firm own and operate a proprietary scam victim-reporting dataset of greater than one million records related to financial scams?
>
> 8. Name at least one (up to three) active contracts your company has for work supporting a federal law enforcement agency HSI and [Federal Bureau of Investigation ("FBI")] preferred). Identify the Contract vehicle, ceiling value, period of performance, and named operational use cases.
>
> 9. What is the investigative platform your company leverages to support intelligence support services and is it fully operational at the time of this request?



[redacted]

10. Does the proprietary investigative platform include Artificial Intelligence [("AI")] integration that supports agentic data retrieval and entity resolution?

a. If Yes, List the intelligence categories.

b. If Yes, are the multiple intelligence categories integrated into a single platform or is it across multiple?

11. How many preconfigured investigation workflows are operational and in production use in your AI platform at the time of the RFI request.

a. Of the work flows – how many are designed to law enforcement mission typologies?

b. Of the work flows – list each work flow by name with the date it entered production use.

12. Does your platform enable a law enforcement user to flag a specific cryptocurrency wallet linked to illicit activity such that, as funds subsequently move downstream, automated real-time notifications are dispatched to participating VASPs to execute voluntary holds without requiring per-event human coordination? (Distinct from: compliance-based transaction monitoring; episodic operational sprints; indirect-exposure scoring or one-time [Indicators of Compromise ("IOC")] distribution.)

13. If your company supports the capability defined in Q12:

[L]ist the blockchains across which automated downstream propagation is live and operational today;

[N]ame the VASPs that receive the propagated notifications in production today.

14. Does your firm hold an operational partnership with stablecoin issuers for coordinating illicit asset freezes with global law enforcement?

If operational partnerships exist:

[W]hat is the aggregate dollar value of illicit funds frozen via such partnerships to date, and

[W]hat are the underlying blockchains on which their tokens are issued?



[redacted]

> 15. Does your company have investigative analysts currently cleared to work on site at DHS/ICE to support a quick ramp up of onsite work? If yes, how quickly could you staff up?
>
> 16. For contractor personnel, do contractor employees have access to the proprietary suite of tools without additional access fees or license costs?
>
> a. If no, what additional fees would be required to support investigative analysts providing support utilizing an investigative platform?
>
> 17. What is the best price structure for the Government to implement this requirement ([firm-fixed price ("FFP")], [time and materials ("T&M")), etc)
>
> 18. ADDITIONAL DETAILS: Please provide any additional information, feedback, or questions that the Government should be aware when drafting an acquisition strategy. Please note, your questions may not be answered directly, but incorporated into the Government's strategy.

21. On June 2, 2026, CGS timely submitted responsive answers, discussed in detail below, describing its active and relevant federal law enforcement contracts and its capability to meet the Agency's needs as set forth in all 18 prompts in the RFI. *Id.*; *see also* Decl. of [redacted] at ¶ 4.

## II. AGENCY'S NOTICE OF INTENT TO SOLE-SOURCE

22. On June 8, 2026, the Agency issued the NOI to Sole Source to TRM Labs. *See* Ex. G, NOI at 2. As explained above, the Agency cited the authority provided by RFO 6.103-1, FAR Class Deviation 25-11, Rev. 1 to support its intent to pursue a sole-source award to TRM for forensic software and support services to support HSTF investigations. *Id.*

23. The Agency determined that "the circumstances of the contract action deem only one source reasonably available based on the capabilities of the sources." *Id.* The NOI stated that the intended sole source would be a firm-fixed contract for a period of 12 months. *Id.*



[redacted]

24. Notably, the NOI permitted "interested parties" to "express their interest and demonstrate their capabilities in relation to the Statement of Need by submitting a *one-page* response no later than Thursday, June 11, 2026." *Id.* at 3.

25. The Statement of Need was a *two-page* document that identified three primary mission areas:

1. Scam Disruption
    - AI-powered triage of victim complaints and clustering of criminal syndicates.
    - Automated victim outreach and support services.
    - Real-time scam wallet screening for financial institutions and exchanges.
    - End-to-end asset recovery pipeline, including monitoring, tracing, freezing, and forfeiture.
    - Targeting and mapping of transnational criminal organizations.
    - Verification of victim claims and restitution documentation.

2. Cybercrime Disruption and [State, Local, Tribal, and Territorial ("SLTT")] Resilience
    - Unified knowledge base and threat graph for cybercrime, including ransomware and extortion.
    - Indicator of compromise (IOC) database and natural-language query interface.
    - Intelligence packages to support enforcement actions.
    - Ransomware asset recovery and detection of infrastructure overlaps.
    - AI-enabled incident response and threat reporting for state, local, tribal, and territorial entities.
    - Collaboration tools for law enforcement and fusion centers.

3. Sextortion Disruption
    - Targeting and mapping of criminal networks and infrastructure operators.
    - Asset recovery and tracing of proceeds across payment rails.
    - Expansion to consumer messaging platforms and financial institution partners.
    - Integration of freeze pipelines and evidence packaging.



[redacted]

- Engineering and machine learning support for victim identification and perpetrator attribution.
- International field engagement and monitoring.

Statement of Need at 1–2.

26. The Statement of Need also discussed the Agency's need to scale operational capacity rapidly to respond to surge events, special operations, engineering initiatives, and any new partnership activations. *Id.* at 2. Therefore, the Agency required "forward-deployed personnel, international engagement, and participation in mission-related events." *Id.*

27. The Statement of Need explained that the solution must be fully operational and deployable to support "persistent and scalable disruption capabilities, and enable government personnel to independently operate disruption workflows by the end of the implementation period." *Id.* Finally, the Agency stated that the solution "must provide robust audit, governance, and human-in-the-loop decision frameworks, ensuring compliance with privacy and security requirements." *Id.*

28. Critically, as discussed below, a significant number of the requirements from the Agency's RFI, issued on May 28, 2026, did not appear in the final Statement of Need, issued less than two weeks later.

**III. CGS CAPABILITY STATEMENT**

29. On June 11, 2026, CGS timely submitted a one-page capability statement, described in detail below, detailing its ability to meet the mission areas described in the Statement of Need. CGS Capability Statement. CGS explained it could use its "proven investigative platform, AI-enabled triage, real-time threat monitoring, asset tracing and recovery workflows, and federal mission support" as well as "cleared personnel, deployable managed



[redacted]

services, financial institution and VASP coordination, evidentiary intelligence packaging, and governance controls necessary to support immediate mission execution and long-term transition to Government users." *Id.*

30. As explained in detail below, CGS addressed each primary mission area identified in the Agency's Statement of Need. *Id.* CGS further provided its ability to assist with surge operations, partnerships, and managed services transitions, and the benefits of its operational platform, governance, privacy, and human-in-the-loop controls. *Id.*

**IV. Notice of Award and GAO Protest**

31. On July 2, 2026, the Agency posted the Award Notice to TRM. Ex. H, Award Notice. The Award Notice states "[t]his sole-source contract has been awarded to TRM Labs, Inc. for TRM forensic software and support services to support HSTF Investigations. The total contract award amount for this action is $94,655,840.00." *Id.* at 3. The Award Notice, pursuant to RFO 6.301, provides a redacted justification. The Justification, in turn, identifies RFO 6.103-1 as the statutory authority permitting other than full and open competition. J&A at 3.

32. On July 12, 2026, CGS filed an initial protest at GAO alleging that the Agency (1) unreasonably determined TRM was the only contractor that could meet its requirements; (2) failed to meaningfully consider CGS's capability statement; (3) improperly relied on a RFO justification that no longer exists; (4) established requirements that were unduly restrictive; and (5) altered the requirements in such a way as to prevent any meaningful consideration of capability statements.[1]

[1] GAO issued a protective order in the protest.



[redacted]

33. As CGS explained in its GAO protest, if the Agency indicated in the Statement of Need that interested parties had to demonstrate the capability to meet the exact requirements put forth in the RFI to be considered for award, CGS would have demonstrated such capabilities by: (1) acquiring a dataset of the required size and scale, Decl. of [redacted] ¶ 24; (2) integrating the automated notification function into its program, *id.* ¶ 25; and (3) establishing an operational partnership, *id.* ¶ 26.

34. On July 17, 2026, the Agency filed a Request for Dismissal of the protest, Ex. I, and attached an unredacted J&A, Ex. D, and Market Research Report, Ex. J.

35. On July 21, 2026, CGS withdrew its GAO protest and filed a pre-filing notice with the Court.

**COUNT I**
**(The Agency's Determination That TRM Was the Only Source That Could Satisfy the Statement of Need Was Arbitrary and Capricious)**

36. CGS incorporates by reference the foregoing paragraphs as if fully stated herein.

37. Agencies are required to conduct procurements in a manner consistent with applicable law and regulations. CICA requires agencies to obtain full and open competition in their procurements through competitive procedures. 41 U.S.C. § 3301(a)(1); *see also* RFO 6.101. When an agency elects to use other than competitive procedures, CICA requires the agency to execute a written J&A with sufficient facts and rationale to support the use of the cited authority. 41 U.S.C. § 3304(e)(1)(A); *see also* RFO 6.104.

38. When actions in this Court are brought pursuant to § 1491(b) of the Tucker Act, the Court reviews the actions of the Agency "according to the standards set forth in the Administrative Procedure Act." *See Sierra Nevada Co. v. United States*, 154 Fed. Cl. 424, 432 (2021) (internal citations omitted). The Federal Circuit made clear that in the context of a sole-



[redacted]

source award, the APA standards of review apply. *See, e.g., Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086. This means that the Court's review of an agency's decision to conduct a sole-source procurement focuses on whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Utech Prod. v. United States*, 148 Fed. Cl. 542, 548 (2020). The Court will rule in favor of the protestors where the J&A fails to set forth a reasonable basis for the agency's actions. *See Innovation Dev. Enterprises of Am., Inc.*, 108 Fed. Cl. 711, 728 (2013) (finding J&A unreasonable where it rested on unsupported factual conclusion).

39. Here, the J&A rests entirely on the Agency's belief that TRM is the only responsible source that can satisfy the Agency's requirements. As set forth above and below, the Agency is mistaken, and the J&A cannot survive its flawed premise.

40. The J&A is replete with assertions that TRM is the only source capable of meeting the Agency's requirements. J&A at 4, 6–8. That is untrue. CGS's capability statement showed that it could meet all the requirements stated in the Agency's Statement of Need. Specifically, CGS stated that it could "meet the Government's stated requirements through its proven investigative platform, AI-enabled triage, real-time threat monitoring, asset tracing and recovery workflows, and federal mission support." CGS Capability Statement. In its one-page response, CGS addressed all three primary mission areas: Scam Disruption, Cybercrime Disruption and SLTT Resilience, and Sextortion Disruption. *Id.* There simply is no merit to the Agency's contention in the J&A that TRM was the only capable source.

41. First, CGS stated that it tackled scam disruption through "Alterya's AI-powered adversarial collection, which supports victim-complaint triage, automated victim outreach and support, and criminal-syndicate clustering by [redacted]



[redacted]

[redacted]." *Id.* This language directly corresponds to the Statement of Need's discussion under "Scam Disruption." *See id.*; *see also* Statement of Need. Accordingly, CGS demonstrated its capabilities under Scam Disruption.

42. Second, CGS's capability statement described its capabilities regarding Cybercrime Disruption and SLTT Resilience. *See* CGS Capability Statement. Specifically, it discussed CGS's Reactor product that can "threat graph spanning ransomware, extortion, darknet marketplaces, and cyber-enabled financial crime across all major blockchains, [redacted]" *Id.* CGS's capabilities show it can satisfy the Agency's cybercrime and SLTT resilience requirements.

43. Third, CGS demonstrated its ability to disrupt sextortion. *Id.* Specifically, CGS stated that it "addresses sextortion disruption by combining HSI mission experience, cross-payment-rail tracing, consumer-platform and financial-institution collaboration, and field-ready support for victim identification, perpetrator attribution, and targeting of criminal networks and infrastructure operators." *Id.* In this regard, CGS explained that it "currently supports HSI's Child Exploitation Investigations Unit, HERO Program, Victim Identification Program, and Project iGuardian under its enterprise contract with blockchain tracing, illicit payment analysis, and criminal network mapping capabilities proven against sextortion and CSAM financing networks." *Id.* CGS further explained that its Reactor product "traces the proceeds of exploitation across Bitcoin, stablecoins, and privacy coins, with freeze-pipeline integrations enabling rapid asset immobilization through VASPs and partnering stablecoin issuers." *Id.*



[redacted]

44. CGS also addressed "Surge Operations, Partnerships, and Managed Services Transition" to illustrate how it can assist HSTF activities while transferring workflows to Government users. *Id.* CGS further discussed its "Operational Platform, Governance, Privacy, and Human-in-the-Loop Controls" which would benefit the Agency's stated mission and help Government users before operational, enforcement, or victim-facing action is taken." *Id.*

45. In short, the record shows that CGS's capability statement demonstrated its ability to meet all the requirements outlined in the Statement of Need. The Agency even recognized CGS's ability to meet these requirements. *See* Market Research Report at 4 ("In terms of investigative platforms and AI Integration, both TRM Labs and Chainalysis offer mature, operational platforms—Orion and Reactor, respectively—featuring agentic data retrieval, entity resolution, and preconfigured workflows tailored to law enforcement missions."); *see also id.* (identifying CGS as having the two crucial factors (1) experience supporting law enforcement and (2) cleared personnel).

46. For these reasons, the record demonstrates that CGS's capability statement showed that it could meet all the requirements actually stated in the Agency's Statement of Need. As such, the J&A's determination that only TRM could satisfy the Agency's requirements and that "all other sources lack one or more critical capabilities required[,]" J&A at 7, is arbitrary, capricious, and unsupported by the record.

47. Moreover, both the J&A and the Market Research Report identify three "requirements" that CGS failed to demonstrate its capability to meet. They are "automated, real-time disruption capabilities, integrated on-chain and off-chain intelligence, and scalable victim identification and notification[.]" J&A at 6, Market Research Report at 4.



[redacted]

48. But, all of these requirements are wholly absent from the Statement of Need. For example, the Statement of Need references "Automated victim outreach and support services" and "Real-time scam wallet screening for financial institutions and exchanges." Statement of Need at 1. Those are different requirements than "automated, real-time disruption capabilities." Market Research Report at 4; *see also* J&A at 6. Similarly, the Statement of Need does not include the word "integrated" or the terms "on-chain" or "off-chain." *See generally* Statement of Need. Further, in terms of scalability, the Statement of Need references generic "scalable disruption capabilities," not the "scalable victim identification and notification" referenced in the J&A and Market Research Report. *Compare* Statement of Need at 2, *with* J&A at 6 *and* Market Research Report at 4.

49. Further undermining the findings in the J&A, the record shows that the J&A as written *never* actually explains its rationale beyond bald assertions that CGS lacks the three capabilities and it does not ever provide any justification for why CGS's capability statement which tracks directly to the Statement of Need did not meet the requirements. That alone is fatal to the J&A because it cannot provide the Court the required coherent and reasonable explanation to allow the Court to review whether or not the agency abused its discretion by awarding a sole-source contract to TRM. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086.

50. Simply put, the Statement of Need described the three primary mission areas as Scam Disruption, Cybercrime Disruption and SLTT Resilience, and Sextortion Disruption. Statement of Need at 1-2. Under each of these primary mission areas, certain requirements were clearly set out. *Id.* And the record shows that CGS demonstrated its capabilities to meet those requirements. *See* CGS Capability Statement. If the Agency desired other capabilities, such



[redacted]

capabilities must have been included in the Statement of Need to put potential offerors on notice of such requirements.

51. For all these reasons, the Court should find that the Agency's determination that only TRM could meet its needs was arbitrary and capricious and should be set-aside. The Agency's errors prejudiced CGS because, but for the errors, the Agency would have recognized that CGS could meet its needs and would have conducted a full and open competition in which CGS would have had a substantial chance of receiving a contract award given its capabilities, relevant past performance, and the fact that it was the only offeror to respond to the NOI.

## COUNT II
### (The Agency's J&A Was Improper Because It Based the Justification on Requirements from the RFI That Were Absent From the Statement of Need)

52. CGS incorporates by reference the foregoing paragraphs as if fully stated herein.

53. It is blackletter law that an RFI does not represent the Agency's actual requirements. *See, e.g.*, *Onix Networking Corp.*, B-411841, Nov. 9, 2015, 2015 CPD ¶ 330 at 5 (stating that an RFI provided to prospective vendors is not a "solicitation that embodies [the agency's] actual requirements"); *F-Star Zaragosa Port, LLC; F-Star Socorro Holding, LLC*, B-417414, et al., Apr. 15, 2019, 2019 CPD ¶ 148 at 2 (same); *Raytheon Co.*, B-414354.2, May 10, 2017, 2017 CPD ¶ 168 at 2-3, 5 (identifying request for proposals ("RFP") as "controlling document" listing agency requirements, not RFI, when RFP "notified offerors of the agency's intent to issue a sole-source contract" and permitted other responsible sources to submit a capability statement that would be "considered solely for the purpose of determining whether to conduct a competitive procurement"). Yet, despite this well-settled precedent, the record demonstrates that the Agency improperly based its sole-source award on the RFI rather than the



[redacted]

Statement of Need that here is the controlling document and that reflects the Agency's actual requirements.

54. Here, by its plain terms, the RFI explained that it was "not a solicitation announcement." RFI at 3. Rather, it was solely for market research and acquisition planning and information purposes. *Id.* The RFI further noted that "[t]he information provided in this RFI is subject to change and is not binding on the Government." *Id.*

55. The Agency's RFI, issued on May 28, 2026, focused heavily on investigative platform capabilities and how law enforcement may utilize those platforms to combat illicit activity. *See* RFI; *see also* RFI Response. For example, the focus of questions 9, 10, and 11 was on proprietary investigative platforms and whether they use intelligent support services and AI to support "agentic data retrieval and entity resolution" and to design workflows. RFI Response at 8–13.

56. In stark contrast, the final Statement of Need, issued less than two weeks later on June 8, did not emphasize investigative platform capabilities at all. *See* Statement of Need. Instead, it merely referenced the need to "produce investigative lead packets with actionable intelligence for federal law enforcement" and that it sought a "fully operational and deployable platform." *Id.* The detailed, platform-specific inquiries that dominated the RFI disappeared from the Statement of Need entirely.

57. Moreover, the RFI asked whether respondents' platforms permitted law enforcement users to "flag a specific cryptocurrency wallet linked to illicit activity such that, as funds subsequently move downstream, automated real-time notifications are dispatched to participating VASPs to execute voluntary holds without requiring per-event human coordination." *Id.* at 13. That question – which, as discussed below, tracks the architecture of a



[redacted]

single vendor's proprietary product – bore no resemblance to the corresponding language in the Statement of Need, which referred only to "real-time scam wallet screening for financial institutions and exchanges." Statement of Need at 1. These are demonstrably different capabilities.

58. The most notable change from the RFI to the Statement of Need is the addition of the third primary mission area, Sextortion Disruption. *Compare* RFI Response, *with* Statement of Need. The Statement of Need directly identifies Sextortion Disruption as one of three primary mission areas, placing it on equal footing with Scam Disruption and Cybercrime Disruption. Statement of Need at 1–2. Yet the RFI was silent regarding Sextortion Disruption. In fact, the Agency did not use the term "sextortion" anywhere in its 18-question RFI and it was only briefly mentioned in the overall description of the RFI. *See* RFI Response; RFI at 3. This glaring disconnect between the RFI and the Statement of Need provides further evidence that the RFI questions were solely designed for market research and not an expression of the Agency's actual needs.

59. The J&A describes TRM's "unique qualifications" as including "ownership of a proprietary, large scale international scam victim dataset; an AI-native, fully operational investigative platform with proven deployment across federal law enforcement; real-time, automated voluntary asset freeze capabilities through the Beacon Network; formal, in-house partnerships with stablecoin issuers; and a cleared workforce with established experience supporting DHS/ICE operations." J&A at 5. As discussed above and below, CGS met these requirements. But these requirements are not in the Statement of Need, which is the proper basis for the sole source determination *not* the RFI. As such, the Agency acted improperly when it based the J&A on the RFI instead of the Statement of Need. *See, e.g., Raytheon Co.*, B-



[redacted]

414354.2, May 10, 2017, 2017 CPD ¶ 168 at 2-3, 5 (identifying request for proposals ("RFP") as "controlling document" listing agency requirements, not RFI, when RFP "notified offerors of the agency's intent to issue a sole-source contract" and permitted other responsible sources to submit a capability statement that would be "considered solely for the purpose of determining whether to conduct a competitive procurement"). Indeed, the Agency effectively solicited capability statements against one set of requirements and then justified its sole-source award based on a different set of requirements that offerors like CGS had not been asked to address in their capability statements. Put another way, the record shows that the Agency directed potential alternative sources like CGS to submit capability statements against one set of requirements set forth in the Statement of Need and then claimed that a sole-source award was justified because CGS and other alternative sources did not demonstrate capabilities that were referenced in the RFI but that were conspicuously missing from the Statement of Need. That is quintessential arbitrary and capricious conduct.

60. CGS was prejudiced by the Agency's improper decision to base the J&A on the RFI instead of the Statement of Need because CGS either did have the requirements or would have obtained the exact capabilities if the Statement of Need had reflected the Agency's desired requirements. *See* Decl. of [redacted]. ¶¶ 6–26.

61. Moreover, in support of the Agency's flawed determination based upon the requirements in the RFI, the J&A identifies five purported "unique qualifications" of TRM that support the sole-source award. However, once again, the record shows that those qualifications were not unique to TRM at all, that they were not requirements that were actually set forth in the Statement of Need, or that CGS could have demonstrated the capability had it been set forth in the RFI.



[redacted]

62. The first criterion, access to a proprietary scam victim-reporting dataset with over one million records, J&A at 4, is wholly absent from the Statement of Need. While this maps *directly* to a TRM product, CGS would have obtained the required dataset if such a requirement was indicated in the Statement of Need. Decl. of [redacted] ¶ 24.

63. The second criterion, AI-Native investigative platform, CGS's ability to meet this criterion is clearly recognized by the Market Research Report. Market Research Report at 4 ("In terms of investigative platforms and AI integration, *both TRM Labs and Chainalysis offer mature, operational platforms*") (emphasis added). Even absent its inclusion in the Statement of Need, it is clear that both CGS and TRM have this capability.

64. The third criterion, the real-time, automated freeze capabilities across VASPs, J&A at 4, is also wholly absent from the Statement of Need. But notwithstanding that this specific requirement is unduly restrictive, CGS can obtain this specific requirement. Decl. of [redacted] 25.

65. The fourth criterion, the formal operational partnerships requirement, J&A at 5, is also wholly absent from the Statement of Need. Like all the other unduly restrictive requirements that map directly to TRM's product, CGS would have obtained this capability if it was included in the Statement of Need. Decl. of [redacted] ¶ 26.

66. The fifth criterion, the ability to rapidly deploy cleared personnel, J&A at 5, is recognized in the Market Research Report as something that both TRM and CGS have. Market Research Report at 4. Even more damaging, this criterion is identified as crucial. *Id.* But the J&A would have the reader believe that *only* TRM has cleared analysts. J&A at 5. That is simply not true, and it cannot be the justification underpinning the determination that there is only one responsible source.



[redacted]

67. Put simply, either CGS demonstrated, and the Agency recognized, that it could meet the above "unique requirements" or CGS could have demonstrated these requirements if the requirements were included in the Statement of Need.[2]

68. To establish prejudice, CGS must show that absent the violations the decision to make a sole-source award rather than conducting a competitive procurement was irrational and that in a competitive procurement, CGS would have had a substantial chance of receiving the award. *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086.

69. CGS has shown that the decision of the Agency to award a sole-source contract was irrational because it rested on a flawed J&A that improperly relied on the RFI's requirements not those in the Statement of Need. Because CGS submitted a capability statement that properly demonstrated its ability to meet the Statement of Need, it had a substantial chance of receiving award given its capabilities, relevant past performance, and the fact that it was the only offeror to respond to the NOI. Accordingly, CGS was prejudiced by the Agency's actions.

**COUNT III**
**(The Agency Acted Unreasonably When It Determined CGS Could Not Meet the RFI's Needs)**

70. CGS incorporates by reference the foregoing paragraphs as if fully stated herein.

71. Even if the RFI requirements reflected the Agency's actual requirements (it did not for the reasons explained above), the record shows that CGS clearly demonstrated the ability to satisfy the RFI requirements. *See* RFI Response; *see also* Decl. of [redacted]

[2] In the RFD filed at GAO, the Agency argued that CGS could not meet the needs of the Agency because it lacks the ability to enable government personnel to independently operate disruption workflows. But neither the J&A nor Market Research Report reach that conclusion or put forth that as a basis for why CGS is unable to meet the needs of the Agency.



[redacted]

72. The RFI, issued on May 28, 2026, sought a wide range of information from respondents. For example, question 7 asked "Does your firm own and operate a proprietary scam victim-reporting dataset of greater than one million records related to financial scams?" RFI Response at 2. CGS provided a fulsome response detailing its proprietary scam and fraud intelligence capabilities that "support government investigative missions through evidence-backed victim signals, adversarial scam collection, blockchain analytics, and off-chain intelligence." *Id.* Further, CGS explained that its approach using a "higher-confidence intelligence model designed to provide investigators with validated, operationally useful leads" better mitigates risks associated with large, raw public submission record counts. *Id.* Thus, CGS demonstrated its capabilities to satisfy the risks related to financial victim scam reporting and showed how its approach meets and supports the government's stated mission. *Id.*; *see also* RFI at 2 (seeking to fulfill mission under EO 14390); Decl. of [redacted] at ¶¶ 6–11.

73. The RFI also asked whether respondents used an investigative platform to "support intelligence support services" and whether it is "fully operational at the time of this request." RFI Response at 8. Again, CGS provided a comprehensive response. CGS explained it offers "a suite of fully operational solutions centered on Chainalysis' flagship investigation software Reactor, augmented by advanced offerings including Rapid, Data Solutions, Alterya, Hexagate, and Chainalysis agents." *Id.* CGS provided a breakdown of product to illustrate how it leverages intelligence support services. *Id.* at 8–9.

74. Question 12 of the RFI asked about whether respondent's platforms "enable a law enforcement user to flag a specific cryptocurrency wallet linked to illicit activity such that, as funds subsequently move downstream, automated real-time notifications are dispatched to participating VASPs to execute voluntary holds without requiring per-event human



[redacted]

coordination?" *Id.* at 13. CGS provided that even though it "does not offer the exact automated broadcast-to-voluntary-hold mechanism described in the question" it followed law enforcement advice to pursue other solutions. *Id.* CGS instead focuses on the operational outcome and whether VASP receives "a sufficiently accurate, defensible, and actionable trace that it is prepared to review and act upon." *Id.* CGS also expressed its interest in engaging in a productive dialogue with the Agency to come to a reliable approach. *Id.* at 14; *see also* Decl. of [redacted] at ¶¶ 12–16 (further describing how CGS's solution satisfies this requirement).

75. Wholly absent from the Market Research Report and the J&A is a real discussion of why CGS's solutions are not sufficient to meet the Agency's needs. The Agency simply concludes that CGS lacks the ability to meet the Government's needs. But CGS's RFI Response demonstrated that it could meet the Agency's needs and provide a more effective product for the Agency. *See* RFI Response at 2–3, 13–17.

76. Accordingly, even in the face of the tailored RFI, CGS demonstrated its ability to satisfy the needs of the Agency that were reflected in the RFI. Because CGS properly demonstrated its ability to meet the needs of the Agency articulated in the RFI it has shown that it would have had a substantial chance of receiving the award. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 (Fed. Cir. 2001). Therefore, CGS was prejudiced by the Agency's arbitrary actions.

**COUNT IV**
**(The Agency Failed To Meaningfully Consider CGS's Capability Statement)**

77. CGS incorporates by reference the foregoing paragraphs as if fully stated herein.

78. CICA requires agencies to obtain full and open competition in their procurements through competitive procedures. 41 U.S.C. § 3301(a)(1); *see also* RFO 6.101. However, CICA



[redacted]

permits an exception to the use of competitive procedures when there is only one responsible source, and no other supplies or services will satisfy the agency's requirements. 41 U.S.C. § 3304(a)(1); RFO 6.103-1(b).

79. But, when an agency uses the sole-source authority provided at RFO 6.103-1, the agency must provide an opportunity for all responsible sources to submit capability statements and "*requires* consideration of all . . . capability statements received." RFO 6.103(d); *see Career Sys. Dev. Corp.*, B-411346.11, *et al*., May 18, 2018, 2018 CPD ¶ 176 at 10. Indeed, the RFO clearly contemplates that any capability statements must have been considered *as a prerequisite* to invoking the exception to competition. RFO 6.103(d); *see, e.g., Sierra Nevada Co. v United States*, 154 Fed. Cl. 424, 437 (2021) (finding GAO decisions instructive); *see also Harmonia Holdings Grp., LLC v. United States*, 145 Fed. Cl. 583, 597-98 (2019) (providing examples of how an agency can meaningfully consider capability statements); *see M.D. Thompson Consulting, LLC; PMTech, Inc.*, B-297616, B- 297616.2, Feb. 14, 2006, 2006 CPD ¶ 41 at 5, n.6 ("Although [the agency] argues that it 'finalized' its sole-source justification only after reviewing the protesters' capability statements . . . the sole-source justification was already fully approved and cleared by December 9, before [the agency] had evaluated (or even received) the capability statements.").

80. This consideration may not be a "mere formality." *Career Sys. Dev. Corp.*, B-411346.11, *et al.*, May 18, 2018, 2018 CPD ¶ 176 at 10. Rather, an agency's decision to pursue a sole source award is "deficient" when it fails to meaningfully consider other potential sources. *Id.* (emphasis added); *see also Info. Ventures, Inc.*, B-293541, Apr. 9, 2004, 2004 CPD ¶ 81 at 4 (highlighting the fundamental purpose of the sole source notice is to enhance the possibility of



[redacted]

competition.). In other words, an agency cannot credibly claim only one capable source exists where it does not meaningfully assess the capability of other interested offerors.

81. Here, the J&A itself reflects a textbook example of the kind of *pro forma*, check-the-box capability statement exercise that itself is arbitrary. The record reflects that the Agency afforded potential alternative sources like CGS only three days to prepare and submit capability statements in response to the NOI, limited those capability statements to a single page even though the NOI's Statement of Need itself exceeded that length, asked no follow-up questions or sought any clarifications from CGS before terminating the market research process one day after submissions were due, and ultimately evaluated CGS against capabilities that were not disclosed in the Statement of Need.

82. First, the Agency created structural limitations that precluded meaningful consideration. The J&A states that the RFI findings "established that only TRM Labs demonstrated the ability to meet all requirements" and that "[b]ased on the results of this analysis" the NOI was posted that allowed for "interested firms to submit a *one-page* response demonstrating their ability to meet the requirements in the Statement of Need." J&A at 6 (emphasis added).

83. The Statement of Need itself, however, spans one-and-a-half pages and encompasses three complex mission areas – Scam Disruption, Cybercrime Disruption and SLTT Resilience, and Sextortion Disruption – each containing numerous detailed sub-requirements. Statement of Need at 1–2. As such, the record shows that the Agency granted itself more space to articulate its needs than it permitted potential alternative sources like CGS to explain how they



[redacted]

could meet them.[3] Indeed, a respondent like CGS could not even restate the Statement of Need requirements themselves within the allotted page, let alone demonstrate meaningful capability against each one. Simply put, an agency that genuinely sought to determine whether competition was possible would not have imposed constraints that made the capability statement process actually irrelevant by artificially limiting the full ability of a respondent to make showing of their capabilities. In short, the Agency's conduct of this procurement as reflected in the J&A is strong evidence that the NOI was issued as a "mere formality" so that the Agency could proceed with the sole-source award to TRM rather than a genuine effort to determine whether competition was possible. The Agency's decision violates the RFO and is therefore, "not in accordance with law." 5 U.S.C. § 706(a).

84. Second, the Agency's timeline for response and decision-making precluded meaningful consideration.

85. On June 8, the Agency issued the NOI and directed interested parties to "express their interest and demonstrate their capabilities in relation to the Statement of Need by submitting a one-page response no later than Thursday, June 11, 2026." NOI at 3. CGS, despite having only three days, prepared and timely submitted a capability statement that demonstrated its ability to satisfy the Statement of Need. CGS Capability Statement. The Contracting Officer confirmed receipt of the response shortly after CGS submitted it. Ex. K, CGS Email Correspondence at 1.

---

[3] The one-page limitation is even more unreasonable in light of the complexity of the requirement. The Statement of Need describes an enterprise-level blockchain analytics, operational support, and managed services engagement valued at $99.4 million. The notion that any potential alternative source could adequately demonstrate its ability to satisfy such a sweeping requirement in a single page is *per se* unreasonable.



[redacted]

86. On June 12, at approximately 6:36 p.m., the Agency informed CGS that it would not be providing feedback or responding to its capability statement. Because hours earlier, on June 12, the Agency had finalized its market research report that stated that TRM was "the only provider currently able to satisfy all operational, technical, and data needs for the HSTF NCC mission." Market Research Report at 5.

87. The Market Research Report states that the Contracting Officer provided CGS's response to the relevant Subject Matter Expert. *Id.* at 4. The SME then reviewed the response and determined that CGS "would not meet the Government's needs because it lacks automated, real-time disruption capabilities, integrated on-chain and off-chain intelligence, and scalable victim identification and notification." *Id.*

88. The one-day turn around is telling. The Agency did not ask a single clarifying question about CGS's capabilities. It did not request additional information about CGS's existing contracts with HSI, FBI, or DEA. Nor did it seek to understand how CGS's platform and cleared personnel could meet the Statement of Need. Instead, the Agency shut the door on CGS before any meaningful review could have occurred.[4]

89. In short, the Agency's failure to engage with CGS and the speed of its dismissal is strong evidence that the NOI was issued as a "mere formality" so it could proceed with the sole-source award to TRM rather than a genuine effort to determine whether competition was possible. Lack of meaningful consideration is a violation of the procurement regulation. *See, e.g., Career Sys. Dev. Corp.*, B-411346.11, *et al.*, May 18, 2018, 2018 CPD ¶ 176 at 10

[4] Indeed, both the Market Research Report and the J&A are silent on CGS's proposed technical solution providing no insight into why the Agency believed it did not meet its needs as articulated by the Statement of Need.



[redacted]

(sustaining protest and explaining that "the agency's failure to meaningfully consider CSD's capability statement is not a 'mere formality'"). This alone is fatal to the Agency's J&A. *See, e.g., Barnes Aerospace Grp.*, B-298864, *et al.*, Dec. 26, 2006, 2006 CPD ¶ 204 at 7–8 ("The entire purpose of issuing notices seeking expressions of interest and capability is to avoid the need for such sole-source procurements, if possible. Thus, we agree with Barnes that the timing of the J & A here was inconsistent with a request for potential offerors to establish their qualifications to compete.); *Info. Ventures, Inc.*, B-293541, Apr. 9, 2004, 2004 CPD ¶ 81 at 4 (finding one-and-a-half-business day period to submit capability statement insufficient). The Court should agree with GAO that the RFO requires meaningful consideration of capability statements prior to deciding to award a sole-source contract. Or, put another way, the failure to meaningfully consider CGS's capability statement renders the J&A arbitrary such that the APA requires the Agency decision to be set aside.

90. Third, the Agency's continued shifting requirements precluded meaningful consideration.

91. As explained above, under RFO 6.103(d), an agency must give meaningful consideration of whether more than one offeror has the capability to perform the underlying requirement as a prerequisite to invoking the CICA exception. However, an agency cannot credibly claim it assessed whether a potential alternative source exists when the very requirements against which capability was to be measured changed materially between the market research phase and the sole-source notice, particularly when the Agency gave itself only one day to evaluate responses against those new requirements.

92. The Agency's RFI, issued on May 28, 2026, focused heavily on investigative platform capabilities and how law enforcement may utilize those platforms to combat illicit



[redacted]

activity. *See* RFI; *see also* RFI Response. For example, the focus of questions 9, 10, and 11 was on proprietary investigative platforms and whether they use intelligent support services and AI to support "agentic data retrieval and entity resolution" and to design workflows. RFI Response at 8–13. In stark contrast, the Statement of Need, issued less than two weeks later on June 8, did not emphasize investigative platform capabilities at all. *See* Statement of Need. Instead, it merely referenced the need to "produce investigative lead packets with actionable intelligence for federal law enforcement" and that it sought a "fully operational and deployable platform." *Id.* The detailed, platform-specific inquiries that dominated the RFI disappeared from the Statement of Need entirely.

93. Moreover, the RFI asked whether respondents' platforms permitted law enforcement users to "flag a specific cryptocurrency wallet linked to illicit activity such that, as funds subsequently move downstream, automated real-time notifications are dispatched to participating VASPs to execute voluntary holds without requiring per-event human coordination." *Id.* at 13. That question – which, as discussed below, tracks the architecture of a single vendor's proprietary product – bore no resemblance to the corresponding language in the Statement of Need, which referred only to "real-time scam wallet screening for financial institutions and exchanges." Statement of Need at 1. These are demonstrably different capabilities. If the Agency's actual need was "real-time scam wallet screening," then the RFI's specific questioning was designed to elicit a response that only one vendor could provide in order to justify a sole-source award to that vendor. If, on the other hand, the Agency's actual need was the automated downstream tool described in the RFI, then the Statement of Need understated the requirement, and capability statements submitted against the Statement of Need could not have been meaningfully evaluated against the Agency's true requirements. Either way,



[redacted]

the Agency's shifting descriptions of its own needs undermine the integrity of the capability statement process. *See, e.g., M.D. Thompson Consulting, LLC; PMTech, Inc.*, B-297616, B-297616.2, Feb. 14, 2006, 2006 CPD ¶ 41 at 5, n.6.

94. The most notable change from the RFI to the Statement of Need is the addition of the third primary mission area, Sextortion Disruption. *Compare* RFI Response, *with* Statement of Need. The Statement of Need directly identifies Sextortion Disruption as one of three primary mission areas, placing it on equal footing with Scam Disruption and Cybercrime Disruption. Statement of Need at 1–2. Yet the RFI was silent regarding sextortion disruption. In fact, the Agency did not use the term "sextortion" anywhere in its 18-question RFI. *See* RFI Response. Indeed, the term "sextortion" was only used by CGS in its response to question 8 when it identified active CGS contracts with federal law enforcement agencies. *Id.* at 3–7 (describing HSI-C3 Enterprise IDIQ Sole Source Contract, including its "Child Exploitation Investigations Unit (CEIU) / HERO Program / Victim Identification Program (VIP) / Project iGuardian" work).

95. Simply put, the disconnect between the needs articulated in the RFI and the Statement of Need renders the RFI responses meaningless as a basis for evaluating the capabilities of CGS and other potential alternative sources.

96. Collectively, these actions demonstrate that the Agency did not undertake the meaningful consideration required to determine whether CGS could satisfy its actual requirements. Had the Agency actually undertaken a meaningful consideration of CGS's capability statement it would have realized that CGS could meet its needs and a sole-source award is unjustified and in the appropriate competitive procurement CGS would have had a substantial chance of contract award. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086



[redacted]

(Fed. Cir. 2001); *see also Info. Tech. & Application Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

**COUNT V**
**(The Agency's Specifications Are Unduly Restrictive)**

97. CGS incorporates by reference the foregoing paragraphs as if fully stated herein.

98. As noted above, the J&A is improperly based on the RFI rather than the Statement of Need. This is improper because it created a situation where no offeror could have been found to have submitted a sufficient capability statement because the Agency did not make clear the rubric that it would be grading those statements against instead putting forth a Statement of Need that did not adequately reflect what it desired. Even more, the Agency's specifications from the RFI, which the J&A was based on, artificially limited competition by requiring certain specific mechanisms that were unduly restrictive of competition.

99. To determine if a requirement is unduly restrictive, the Court "examines whether a particular procurement requirement unduly restricts competition and inquires whether the restrictive requirement is required to meet the government's minimum needs." *Piedmont Propulsion Sys. LLC v. United States*, 167 Fed. Cl. 72, 82 (2023) (citation modified). If the Court determines that the requirement "violates the prohibition against restrictive terms that are not required to meet the government's minimum needs, the requirement will be deemed to be unduly restrictive and the agency's decision to include the requirement in the solicitation will be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citation modified).

100. Here, the Agency is unable to justify the RFI requirements because those requirements were tailored to ensure that only TRM can be found to be a responsible source.



[redacted]

101. Multiple questions in the RFI were unduly restrictive and are designed to ensure that TRM could be awarded a sole-source contract.

102. First, Question 7 of the Agency's RFI asks, "Does your firm own and operate a proprietary scam victim-reporting dataset of greater than one million records related to financial scams?" RFI Response at 2. CGS's response indicated that its solution "provides a safer, more reliable, and more operationally relevant capability for DHS NCC than reliance on a raw-count public victim-reporting database." *Id.* at 3. CGS's proposed solution "uses a higher-confidence intelligence model designed to provide investigators with validated, operationally useful leads" instead of a public scam victim-reporting database. *Id.* at 2. This approach better serves law enforcement and prevents the well documented flood of unreliable submissions associated with open submission portals. *Id.* at 3.

103. Moreover, a requirement that is solely based on a volume threshold "does not distinguish between verified and unverified records, between records with identified reporters and those with anonymous self-attestation, or between records whose provenance supports downstream legal process and those that require independent corroboration before they can be acted upon." Decl. of [redacted] ¶ 8. Paragraph 10 of the declaration lays out the stark difference between the approaches. *Id.* ¶ 10. CGS's approach reduces the burden for downstream use as well as provides other logistical benefits. *Id.* But the J&A never discusses why this solution does not fit the Agency's need.

104. Second, Question 12 asks, "Does your platform enable a law enforcement user to flag a specific cryptocurrency wallet linked to illicit activity such that, as funds subsequently move downstream, automated real-time notifications are dispatched to participating VASPs to execute voluntary holds without requiring per-event human coordination?" *Id.* at 13.



[redacted]

Notwithstanding that this question also tracks directly to TRM's proprietary product, CGS's response informed the Agency that its "live operational coordination with law enforcement" is a more reliable approach to high confidence tracing as opposed to automatic, overbroad, notifications. *Id.* at 14.

105. CGS's asset recovery architecture contains five components which differs from the automated broadcast model from the RFI and provides significant advantages. Decl. of [redacted] ¶¶ 15-16. But the J&A never explains why this does not meet the Agency's needs.

106. Third, Question 14 of the Agency's RFI asks, "Does your firm hold an operational partnership with stablecoin issuers for coordinating illicit asset freezes with global law enforcement?" RFI Response at 15. As CGS noted in its response, "[t]he phrase 'operational partnership' appears engineered to privilege a single publicized tripartite arrangement (issuer + chain + one analytics vendor) over the broader, issuer-neutral, chain-neutral facilitation model [CGS] operates." *Id.* The decision to focus on "operational partnership", as CGS noted, appears designed to benefit a single offeror to the potential detriment of the Agency because broader models exist to serve the same purpose. CGS's model, instead of an operational partnership, provides broader coverage and still provides the Agency with the functionality that it seeks – mainly the ability to freeze verified illicit addresses holding stablecoins in a timely manner. *Id.* at 16.

107. As the declaration more fully explains, CGS's relationships "cover [redacted]. CGS facilitates law-enforcement-to-issuer contact for freeze requests on a continuous basis. This facilitation model predates publicly branded 'operational partnership' arrangements in the industry." Decl. of [redacted] ¶ 20. Beyond the additional breadth that these relationships provide, CGS's model also provides three



[redacted]

distinct advantages because it is 1) [redacted], 2) [redacted], and 3) [redacted]. Decl. of [redacted] ¶ 21. But the J&A never explains why this technical solution does not meet the Agency's needs.

108. Against this backdrop, the Agency must explain why these limiting requirements, the arbitrary raw-count database, the automatic notification mechanism, and the "operational partnership" withstand logical scrutiny. But, when an offeror, like CGS, has demonstrated that it is able to meet the needs of the Agency without the specification while, potentially, providing a more effective solution, the Agency faces an uphill battle. CGS did so for all three unduly restrictive specifications. CGS's RFI Response makes clear that it can meet the needs of the Agency to implement E.O. 14390 while also proposing solutions that are more effective for the Agency.

109. Even more alarming, some criteria in the RFI appear to track directly to TRM's proprietary product. The RFI asked whether respondents' platforms permitted law enforcement users to "flag a specific cryptocurrency wallet linked to illicit activity such that, as funds subsequently move downstream, automated real-time notifications are dispatched to participating VASPs to execute voluntary holds without requiring per-event human coordination." RFI Response at 13. That question which tracks the architecture of a single vendor's proprietary product bore no resemblance to the corresponding language in the Statement of Need, which referred only to "real-time scam wallet screening for financial institutions and exchanges." Statement of Need at 1. These are demonstrably different capabilities. If the Agency's actual need was "real-time scam wallet screening," then the RFI's specific questioning was designed to elicit a response that only one vendor could provide in order to justify a sole-source award to that vendor.



[redacted]

110. In sum, the Agency's reliance on the RFI's restrictive specifications to justify limiting competition violated CICA because the Agency failed to establish in the J&A that those restrictive specifications reflected its actual minimum needs. Indeed, the record demonstrates that CGS's proposed solution, as set forth in its RFI response, could satisfy the Agency's RFI requirements. However, the Agency's J&A neither addresses those proposed solutions nor explains why they would fail to satisfy the Agency's minimum needs. The Agency's failure to consider CGS's less restrictive solutions or to explain why such solutions were inadequate provides an additional basis for this Court to find the Agency's sole-source justification arbitrary, capricious, and contrary to law.

111. The Agency's failure to do so prejudiced CGS because absent the unduly restrictive requirements CGS would have had a substantial chance of contract award because without the unduly restrictive requirements there would have been no need for a sole-source procurement. *See Innovation Dev. Enter. of Am. v. United States*, 108 Fed. Cl. 711, 724 (2013). CGS submitted a capability statement that properly demonstrated its ability to perform the work, it had a substantial chance of receiving award given its capabilities, relevant past performance, and the fact that it was the only offeror to respond to the NOI. Accordingly, CGS was prejudiced by the Agency's actions.

112. For these reasons, the Court should grant CGS the relief it seeks and require the Agency to engage in full and open competition in accordance with CICA's requirements.

**COUNT VI**
**(The Agency Relied on a Justification That Was Removed in the FAR Overhaul)**

113. CGS incorporates by reference the foregoing paragraphs as if fully stated herein.



[redacted]

114. The RFO had a clear goal: "faster acquisitions, *greater competition*, and better results." Ex. L, RFO Overhaul Page (acquisition.gov) (emphasis added). In support of this clear goal, the RFO removed certain exceptions that could justify sole-source procurements. Under RFO 6.103-1(b), "[a]gencies may contract without providing for full and open competition when the supplies or services required by the agency are available from only one responsible source and no other type of supplies or services will satisfy agency requirements." RFO 6.103-1(c) outlines the two situations where "[s]upplies and services may be deemed as available from only one source" as either when (1) "an unsolicited research proposal shows a unique and innovative concept . . . the substance of which is not otherwise available to the Federal Government and does not resemble the substance of a pending competitive acquisition" or (2) "awarding a follow-on contract for the continued development or production of a major system or highly specialized equipment." But neither situation is appropriate in this procurement because TRM did not submit an unsolicited research proposal nor is this an award of a follow-on contract for production of a major system or highly specialized equipment.

115. On June 23, 2026, the proposed revisions to the RFO were posted in the Federal Register. RFO 6.103-1(c) was revised to state that "[s]upplies and services may be deemed as available from only one source under this authority under the following circumstances, *including but not limited to*:" certain examples like unsolicited research proposals and others. 91 Fed. Reg. 37636, 37645 (June 23, 2026) (emphasis added). The inclusion of the phrase "including but not limited to" is critical to demonstrating that the current RFO 6.103-1(c) only allows for a finding of one responsible source in the listed examples because if it did not the inclusion of the phrase would be superfluous. To be sure, moving forward under the *new* RFO 6.103-1(c) it is clear that the provided examples are not an exclusive list but under the current RFO 6.103-1(c) the plain



[redacted]

language of the regulation makes clear that an agency may only find one responsible source in the provided examples.[5]

116. Previously, the FAR contained other justifications for determining that only one responsible source existed for an agency's requirements. *See* FAR 6.302-1(b). For example, an agency could previously justify a sole-source contract by finding that its minimum needs could be satisfied with "[u]nique supplies or services available from only one source or only one supplier with unique capabilities," FAR 6.302-1(b)(1), or if an agency determined that an agency's standardization program requires "only specified makes and models of technical equipment and parts will satisfy the agency's needs for additional units or replacement items, and only one source is available," FAR 6.302-1(b)(4).

117. But under the RFO, these justifications no longer exist. After a class deviation, agencies cannot piecemeal apply the RFO and the FAR. Rather, agencies must operate solely under the RFO. DHS issued its class deviation adopting the RFO on July 8, 2025, months before beginning this procurement. Ex. M, DHS Class Deviation at 1. Therefore, the Court should require the Agency to conduct a full and open procurement in accordance with the RFO which only allows for limited statutory exceptions from full and open procurements.

118. Therefore, the Agency's decision to move forward with a sole source contract on the basis of a justification that is no longer part of the governing regulation is "not in accordance with law" under the APA and its decision should be set-aside. Because CGS, as detailed above,

---

[5] The Agency, in its RFD, recognizes that the revision of the language in the proposed RFO is clarifying language to correct the limiting nature for the only one responsible source sole-source justifications as it currently exists under the applicable DHS deviation. *See* Ex. I at 9–10 ("[T]he proposed regulation may simply be clarifying the language to avoid specious arguments such as the one raised here").



[redacted]

would have had a substantial chance of award if the Agency complied with the RFO rather than relying on outdated FAR justifications, it has been prejudiced. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086.

**COUNT VII**
**(The Agency's Failure to Plan This Procurement Cannot Be the Basis For a Sole-Source Award)**

119. The Agency cannot contract without full and open competition on the basis of a lack of planning by the Agency. RFO 6.103(b)(1). While an agency does not have to engage in perfect planning, planning must be reasonable. *Infrastructure Def. Tech, LLC v. United States*, 81 Fed. Cl. 375, 398 (2008). Planning is unreasonable when an accelerated timeline impacts the ability to conduct a competitive procurement. *Innovation Dev. Enter. of Am. , Inc.* , 108 Fed. Cl. at 727.

120. When taken together, the Agency's accelerated timeline for this procurement and its shifting requirements support the conclusion that the decision to sole-source is the result of a lack of reasonable planning. Indeed, the Agency issued the RFI on May 28, received CGS's detailed 20-page response on June 2, published the sole-source NOI on June 8, set a three-day response window closing June 11, and cut off all engagement on June 12. Thus, in a span of roughly two weeks, the Agency went from market research to shutting down any form of competition. This breakneck pace left no time for the Agency to analyze and digest market research results, reconcile the divergent requirements between its own publications, or engage in the kind of deliberate acquisition planning that CICA and the RFO contemplate. *See, e.g.*, 41 U.S.C. § 3304(e)(5); RFO 6.103(b)(1).

121. Here, the J&A continually mentions that time is of the essence. J&A at 6–7. But, the Agency's decision to artificially compress the timeline of this procurement cannot justify its



[redacted]

decision to award a sole-source contract. *See Innovation Dev. Enter. of Am., Inc.*, 108 Fed. Cl. at 727. Because, as discussed above, CGS would have had a substantial chance of award if the Agency engaged in reasonable planning with sufficient time to conduct a competitive procurement, it has been prejudiced. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086; *CSI Aviation, Inc.*, 181 Fed. Cl. at 174–76.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CGS respectfully asks this Court to enter judgment in its favor and against Defendant and to:

1. Declare that the Agency's sole-source award to TRM for the contract at issue in this procurement was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and regulation;
2. Permanently enjoin performance of the sole-source contract awarded to TRM;
3. Direct the Agency to conduct a full and open competition for advanced analytical and AI platform support services to fulfill its mission under E.O. 14390;
4. Award to CGS its costs and attorneys' fees under the Equal Access to Justice Act in pursuing this action; and
5. Grant CGS any further relief that the Court deems appropriate.

Dated: July 27, 2026

Respectfully submitted,

Marques O. Peterson
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
202.663.8000
202.663.8007 (fax)

Of Counsel:
J. Matthew Carter
Sarah M. Robitaille
Timothy A. Wieroniey
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5406



[redacted]

(213) 488-7102
(213) 629-1033 (fax)
matt.carter@pillsburylaw.com

marques.peterson@pillsburylaw.com

*Attorney of Record for Chainalysis Government Solutions, LLC*



[redacted]

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the CM/ECF system. A true and correct copy was also served by email to the following parties, this 27th day of July 2026:

United States Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Fax: (202) 305-2062
Email: nationalcourts.bidprotest@usdoj.gov

Steve Gillingham
Assistant Director
United States Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
E-mail: steve.gillingham@usdoj.gov

Marques O. Peterson



[redacted]